IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| **UNITED STATES OF AMERICA** f/u/b/o **EASE PAINTING AND CONSTRUCTION, INC.** 152 West Lafayette Avenue Baltimore, Maryland 21217 | * * * |
| Plaintiff, | * |
| v. | * Case No. _____ |
| | * |
| **FEDERAL INSURANCE COMPANY** 202B Halls Mill Road Whitehouse Station, New Jersey 08889 | * * |
| **SERVE ON:** **The Honorable Kathleen A. Birrane** Maryland Insurance Commissioner Maryland Insurance Administration 200 St. Paul Place, Suite 2700 Baltimore, Maryland 21202 | * * * |
| and | * |
| **HARKINS BUILDERS, INC.** 10490 Little Patuxent Parkway Columbia, Maryland 21044 | * * |
| **SERVE ON:** **James C. Thompson, Jr.** 10490 Little Patuxent Parkway Columbia, Maryland 21044 | * * * |
| Defendants. | |

**COMPLAINT FOR ENFORCEMENT OF PAYMENT BOND UNDER THE MILLER ACT (40 U.S.C. §§ 3131-3134), BREACH OF CONTRACT, AND FOR RIGHTS UNDER THE PROMPT PAY ACT (31 U.S.C. §3905)**

- 1 -

Plaintiff, the United States of America for the use and benefit of EASE Painting and Construction, Inc., by and through undersigned counsel, respectfully files this Complaint and brings this action against the Defendants Federal Insurance Company and Harkins Builders, Inc., each one, and in support thereof and for cause, Plaintiff states as follows:

## PARTIES

1. Plaintiff, EASE Painting and Construction, Inc. ("EASE") is, and was at all times mentioned, a corporation organized and existing pursuant to the laws of the State of Maryland, with its principal place of business located at 152 West Lafayette Avenue, Baltimore, Maryland 21217. Plaintiff is engaged in the business of performing industrial painting and coating contracting, and construction services. Relative to this action, EASE was, at all times mentioned, a first-tier subcontractor of Defendant Harkins Builders, Inc.

2. Defendant, Federal Insurance Company ("Federal"), is an insurance and surety company which is, and was at all times mentioned, a corporation organized and existing pursuant to the laws of the State of New Jersey, with its principal place of business located at 202B Halls Mill Road, Whitehouse Station, New Jersey 08889. At all times relevant hereto, Federal was licensed to issue, and did issue, payment bonds in furtherance of, and for, Federal Government construction projects in Prince George's County, Maryland.

3. Defendant, Harkins Builders, Inc. ("Harkins") is, and was at all times mentioned, a corporation organized and existing pursuant to the laws of the State of Maryland, with its principal place of business located at 10490 Little Patuxent Parkway, Columbia, Maryland 21044. Defendant is engaged in the business of performing construction services for private enterprises and public entities including, as is applicable herein, construction services for the United States Government ("USG").

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as this action arises under the laws of the United States, specifically 40 U.S.C. §3131 et seq., referenced and known as the Miller Act ("Miller Act"). Pursuant to 40 U.S.C. §3133(b)(3)(B), claims under the Miller Act are required to be brought in a United States District Court.

5. The Court exercises and maintains supplemental jurisdiction of the breach of contract allegations herein pursuant to 28 U.S.C. §1367(a).

6. The venue of this action is properly within this Court pursuant to 28 U.S.C. §1391(b), as the facts, occurrences and events giving rise to this claim substantially occurred at the Canine Training Facility, James J. Rowley Training Center, a USG facility located in Beltsville, Maryland ("JJRTC"). Assignment within the Southern Division is appropriate pursuant to Local Rule 501.4(b)(ii) as the events described in the Complaint took place within the territorial jurisdiction of the Southern Division.

7. This Court maintains personal jurisdiction over the Defendants, each one, in that the Defendants persistently and continuously transact business in the State of Maryland and within the territorial jurisdiction of this Court. This Court further maintains personal jurisdiction over Harkins in that Harkins is domiciled within, and is headquartered within, the State of Maryland and within the territorial jurisdiction of this Court.

## FACTS AND BACKGROUND

8. On or about November 6, 2017, the United States of America, through the Department of the Army, United States Army Corps of Engineers ("USACE"), District Baltimore ("ENDIST Baltimore"), awarded Firm Fixed Price Contract Number W912DR-18-C-

0003 (the "Contract"), to Harkins, for the United States Government's construction of the replacement Canine Training Facility at JJRTC (the "Project").

9. Upon information and belief, the Project involved the construction of a Canine Training Facility for the use and benefit of the United States Secret Service, specifically for the purpose of training tactical and sniffer canines. Further upon information and belief, the Project included the construction of a building containing approximately 20,500 square feet of space ("Main Building"), costing approximately $9.6 million, and featuring work areas, training areas, multi-purpose rooms, and medical areas, among other facilities. Separately, the Project included construction of a kennel facility for the care and maintenance of the canines ("Kennel Building").

10. As a requirement of the Contract, Harkins, as principal, executed a payment bond, on November 8, 2017, to the United States of America, Bond No. 8245-96-98 (the "Payment Bond") in the penal sum of $9,603,000. At all times, the commercial surety guaranteeing Harkins' payment obligations to claimants under the Payment Bond, including Plaintiff, is and was Federal.

11. On or about March 21, 2018, Harkins and EASE entered into, and executed, a Subcontract in the firm-fixed amount of $115,838.00 (the "Subcontract"), pursuant to which EASE to was to supply material, equipment and labor to apply specified concrete floor coating, and high-performance epoxy floor coatings, for the Project.

12. Upon information and belief, ENDIST Baltimore engineers designed and specified the Project, which design, and specifications, were then provided to Harkins. Harkins, therefore, subcontracted EASE to perform its subcontracted scope of work based upon a fully

complete design, absolutely inclusive of all plans, specifications, detailing of work scope, materials, performance and quality requirements.

13. The design specifications and technical requirements of the Contract and Subcontract (together, the "Contract Documents") specifically required that, prior to commencement of full performance of its coating scope of work, EASE was to construct "Mock Ups" of its work product. The Mock Up requirement, which was specified, stipulated and stated in the Contract Documents, established the definitive and objective quality standards and technical requirements and expectations of the EASE work. It was the Mock Up that all performance by EASE was to be judged against for the duration of the Project.

14. The specifications of the Contract Documents state that Mock Ups are to: (1) be constructed, protected and maintained for the entire duration of the Project; (2) be approved by the USG prior to, and as a condition precedent to, further performance of the full scope of subcontracted work; (3) establish the expected quality standards of workmanship, and; (4) function as the comparative basis of actual work conditions and expectations for USG inspection and acceptance of EASE's work and performance for the duration of the Project.

15. The construction, maintenance and protection of the Mock Ups, therefore, constituted a material aspect of the Project, and deliverable of the Contract Documents, and once the Mock Ups were approved and accepted by the USG, the Mock ups were to be protected and maintained in place for the duration of the Project until final completion and acceptance of EASE's work. The Mock Ups, as approved by the USG, were critical to the establishment of standards regarding EASE's performance, and to establishing the quality standards for all inspections and acceptances by the USG of EASE's progressing and completed work.

16. EASE completed the Mock Ups of its painting and coating work, and the USG inspected and accepted the Mock Ups. Contrary to the explicit plans, specifications and technical requirements of the Contract Documents, however, shortly after the USG inspected and accepted the EASE Mock Ups, Harkins unilaterally destroyed the Mock Ups without notice or explanation to EASE.

17. Due to the unilateral destruction of the Mock Ups by Harkins, the USG thereafter used small "manufacturer samples" prepared by manufacturers under factory conditions, and not "real world" conditions, as the exemplar and quality standard for USG inspection and acceptance of the concrete floor coatings and high-performance floor coatings provided by EASE

18. The unilateral destruction of the EASE Mock Ups: (1) eliminated the USG accepted comparative quality standards and workmanship expectations established by the Mock Ups as the basis for inspections and acceptance of EASE work; (2) subjected EASE to an arbitrary "over-specification" / "over-inspection" criteria and situation, inexorably altering the accepted basis for government inspections and acceptance of EASE's work product; (3) created a constructive change condition to EASE, imposing upon EASE a higher, arbitrary acceptance standard, as the government thereafter used "manufacturer samples", prepared under manufacturing conditions, for its inspection and acceptance of the work by EASE, and (4) collectively resulted in escalated costs and extended time of performance to EASE in ongoing re-work efforts to attain the higher acceptance standards caused by the Harkins breach and constructive change conditions created by Harkins.

19. EASE provided Harkins with ample notifications and submission of its claims, disputes and concerns following Harkins' destruction of its Mock Ups, in addition to priced

change proposals with respect to the changes the destruction of the Mock Ups caused, and the resulting additional work required.

20. Despite the escalating and increasing cost of performance due to the constructive changes arising from the destruction of the Mock Ups and caused by the acts and omissions of Harkins, Harkins refused to accept or negotiate change orders submitted by EASE, or to negotiate equitable compensation to EASE at all.

21. Additionally, as EASE's work commenced, various cracks developed in the newly poured and cured concrete surfaces and sub-surfaces, which EASE was required to coat in performance of the Subcontract. The poured concrete floors developed cracks in various lengths and depths scattered randomly throughout both the Main Building and the Kennel Building. EASE promptly and properly notified Harkins of this condition and the inadequate state of the surfaces to receive EASE's work. Instead of Harkins directing its concrete subcontractor to cure and fix these developing cracks, however, Harkins instead directed EASE to perform the subsurface concrete crack repairs work, without proper change modification, and despite the fact that subsurface concrete repairs is not within the scope of the EASE Subcontract.

22. Due to Harkins mandatory direction, however, EASE was compelled to perform the additional work and repairs to the concrete floor surfaces. Additionally, EASE was responsible to ensure that warrantability of the coating application. EASE was further compelled to make these out of scope and as yet uncompensated repairs, because the coatings manufacturers' specifications and parameters require that coatings must be applied to intact sub-surfaces ready to receive the coatings, or the work will not be warrantable. To ensure its one-year warranty for the epoxy floor coatings remained valid, EASE could only apply the epoxy on an intact concrete floor surface or be in jeopardy of default. Harkins provided EASE with no

additional compensation for this work arising from acts and omissions of others and it constituted a constructive change.

23. Even though Harkins directed EASE to perform subsurface concrete crack repair work that was not required under the EASE Subcontract, these cracks were defects not caused by any act or omission of EASE. EASE notified Harkins that the requested work was out of the scope of the Subcontract, and submitted a Change Cost Proposal to Harkins, which Harkins dismissed. Nonetheless, EASE was compelled to perform as Harkins directed and completed this Change work without any equitable consideration, compensation or increase in the Subcontract price.

24. As the Prime Contractor, Harkins was responsible to properly sequence and schedule the Project work flow, coordinate its various subcontractors, optimize timeliness of the work and the proper sequencing of the work, and to protect completed work from the movements and activities of other subcontractors and separate contractors at the site. The work of EASE, however, suffered repeated damage and contamination by other subcontractors, which EASE was then compelled to recoat and/or clean as each incidence required. Despite the repeated notices by EASE to Harkins regarding this continuing condition, Harkins failed to cure or remedy the condition, and failed to compensate EASE for the additional work and costs imposed by the condition or to charge other subcontractors therefor.

25. EASE completed all the work required of it under the Subcontract, and all the additional work requested of it by Harkins and necessitated by the acts and omissions of Harkins, in a timely and workmanlike manner.

26. During the progress of the work, EASE submitted invoices to Harkins and Harkins made periodic partial payments to EASE.

27. Upon information and belief, the USG paid Harkins in full for the value of work EASE performed under the Subcontract.

28. Further, although Harkins received full and final payment by the USG, Harkins failed to pay EASE the full amount due under the Subcontract upon final completion and acceptance of the entire Project by the USG. Pursuant to the Subcontract, Harkins was required to pay EASE for its work once payment was received by Harkins from the USG. In addition, pursuant to statute, Harkins was required to pay EASE for its work within seven (7) days of receipt by Harkins of payment for EASE's work.

29. In consideration of the monies still owed EASE under the original sum of the Subcontract of $15,031.25, and in further consideration of the costs and expenses of labor and materials provided by EASE in furtherance of the Project and arising from constructive changes and damage to EASE's Work caused by the acts, omissions and breaches of Harkins, as stated herein, in the amount of $104,534.40, there remains $119,565.65 due and owing to EASE, by Harkins, for labor and materials furnished on the Project.

30. Despite EASE's repeated requests for payment, to date, neither Harkins nor Federal have paid EASE the outstanding balance for work performed at the Project in the amount of $119,565.65.

31. EASE last provided labor, materials and/or services for or about the construction work on the Project within one year of the filing of this action.

32. EASE has complied with all the conditions precedent to the filing of this action and as required under the aforesaid Payment Bond and the Miller Act.

33. There remains a balance due and owing to EASE from Harkins in the amount of $119,565.65, which amount has been paid to Harkins by the USG and is being withheld by Harkins without justification and in bad faith.

## COUNT I: BREACH OF CONTRACT

### (Against Harkins)

34. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 33 as if fully set forth in this cause of action.

35. At all times relevant hereto, the Subcontract between Harkins and EASE is, and was, a valid and enforceable contract.

36. EASE fully performed its obligations under the Subcontract in a good and workmanlike manner and is due payment thereunder in the amount of $119,565.65.

37. Harkins breached the terms and provisions of the Subcontract by failing to make payments for work rendered as agreed, despite frequent demand for such payment and, through Harkins own acts and omissions, causing conditions and constructive changes which increased EASE's costs and obligations while directing EASE to expend further efforts, cost and expense, and further, refusing to provide EASE with equitable compensation therefor.

38. Despite repeated demand, Harkins failed and refused to pay EASE the outstanding principal balance of $119,565.65, constituting a material breach of the contract and EASE has incurred damages in the amount of at least $119,565.65 on account of Harkins' breaches of contract.

39. EASE is further entitled to the award of its attorney's fees pursuant to Md. Ann. Code, Real Property § 9-303(c), providing for the award of attorney's fees in the event, inter alia, a contractor has acted in bad faith in failing to pay undisputed amounts owed to a subcontractor.

WHEREFORE, Plaintiff, the United States of America f/u/b/o EASE Painting and Construction, Inc. demands judgment against Defendant, Harkins Builders, Inc., in a sum greater than $75,000.00, plus pre-judgment interest, attorneys' fees, costs, post-judgment interest at the legal rate, and such further relief as the Court may deem just and proper.

## COUNT II: MILLER ACT AND BREACH OF PAYMENT BOND

### (Against All Defendants)

40. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 39 as if fully set forth in this cause of action.

41. This is an action against Harkins and Federal on the Payment Bond provided for the Project, for EASE's unpaid work performed, and unpaid labor, material, and services on the Project, in the amount of $119,565.65.

42. As a first-tier subcontractor supplying labor, material and related services to the Project, EASE is a proper claimant under the Payment Bond, EASE has not been paid in full by Federal or Harkins, and such non-payment is a violation of the terms of the Payment Bond, and the amount of $119,565.65 has been due and owing to EASE for more than ninety (90) days.

43. All conditions precedent to bringing a claim on the Payment Bond and to recovering under the Payment Bond have been satisfied. Pursuant to 40 U.S.C. §3133(b)(1), EASE is entitled to pursue a civil action on the Payment Bond for the amount unpaid at the time the action is brought, and EASE may prosecute the action to execution and judgment for the amount due.

44. This action is timely filed pursuant to 40 U.S.C. §3133(b)(4).

45. Pursuant to the Payment Bond and under applicable law, Federal and Harkins are jointly and severally liable to EASE for the unpaid work performed and the unpaid labor,

materials, and services EASE provided for the Project and in furtherance of the Project, in the amount of $119,565.65.

46. Despite demand, Federal and Harkins have failed and refused to pay EASE for the outstanding balance of its labor and materials furnished to the Project in the amount of $119,565.65.

WHEREFORE, Plaintiff, the United States of America f/u/b/o EASE Painting and Construction, Inc. demands judgment against Defendant, Harkins Builders, Inc. and Federal Insurance Company, jointly and severally, in a sum greater than $75,000.00, plus pre-judgment interest, attorneys' fees, costs, post-judgment interest at the legal rate, and such further relief as the Court may deem just and proper.

## COUNT III- BREACH OF 31 U.S.C. § 3905

**(Against All Defendants)**

47. Plaintiff repeats and realleges the allegations set forth in Paragraphs 1 through 46 as if fully set forth in this cause of action.

48. The Prompt Pay Act, 31 U.S.C. § 3905, et seq., (the "Prompt Pay Act"), required Harkins to pay EASE its share of funds received by Harkins from the USG within seven (7) days of receipt, or to provide EASE and the Contracting Officer with a written notice specifying any amount withheld pursuant to the Subcontract, the specific reasons for the withholding, and whatever remedial action is necessary to remedy the withholding. *See* 31 U.S.C. § 3905(g).

49. Despite multiple demands for payment made by EASE for amounts due and owing, Harkins has, without cause and in bad faith, refused and/or neglected to pay EASE for amounts Harkins has been paid by the USG.

50. Harkins has never provided EASE or, upon information and belief, the Contracting Officer, with notice of withholding under the Subcontract as is required by the Prompt Pay Act in order to withhold payment due and owing, and Harkins' failure to pay EASE amounts Harkins has been paid by the USG for work performed by EASE is in derogation of the Prompt Pay Act.

51. Pursuant to the Prompt Payment Act, 31 U.S.C. §§3901, et seq., EASE is entitled to interest on all sums due.

52. As surety on the Payment Bond, Federal is obligated to ensure and/or satisfy prompt payment and full payment, or otherwise to make payment on behalf of the principal Harkins.

WHEREFORE, Plaintiff, the United States of America f/u/b/o EASE Painting and Construction, Inc. demands judgment against Defendant, Harkins Builders, Inc. and Federal Insurance Company, jointly and severally, plus pre-judgment interest, attorneys' fees, costs, post-judgment interest at the legal rate, and such further relief as the Court may deem just and proper.

Respectfully Submitted,

/s/ Joseph L. Katz, Esq.

Joseph L. Katz, Esq., MD Bar #28029
KATZ LAW
6701 Democracy Boulevard, Suite 300
Bethesda, Maryland 20817
(410) 499-2615
joe@joekatzlaw.com
**Attorney for Plaintiff**
**United States of America**
**f/u/b/o EASE Painting and**
**Construction, Inc.**